**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2019 IL App (3d) 170335-U

Order filed November 1, 2019

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-17-0335 Circuit No. 16-CF-503 |
| FRANK O. McCLENDON, | ) ) ) | Honorable Kevin W. Lyons, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE WRIGHT delivered the judgment of the court.
Justices Holdridge and O'Brien concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   Based on this record, trial counsel was not ineffective and the State proved defendant guilty of robbery beyond a reasonable doubt.

¶ 2     A Peoria County jury convicted defendant, Frank O. McClendon, of robbery following a trial. The trial court sentenced defendant to a term of 26.5 years in the Illinois Department of Corrections. Defendant appeals. Defendant claims that he received ineffective assistance of counsel and should receive a new trial. Alternatively, defendant asserts the conviction should be set aside without a new trial because the State's evidence did not establish defendant's guilt beyond

a reasonable doubt. Finally, defendant requests a remand to the trial court with directions to conduct a *Krankel* hearing to determine if the court's and defense counsel's mutual mistake regarding the range of punishment rose to the level of ineffective assistance of counsel.

¶ 3                                                              I. BACKGROUND

¶ 4        On August 2, 2016, a Peoria County grand jury returned a bill of indictment against defendant alleging that on or about July 9, 2016, defendant committed the offense of robbery pursuant to section 18-1(a) of the Criminal Code of 2012 (the Code) (720 ILCS 5/18-1(a) (West 2016)) in that "[defendant] took property being a purse and its contents from the person of [the victim] by the use of force[.]"

¶ 5        At a pretrial hearing on October 11, 2016, the trial court informed defendant that he was "facing 6 to 30 years in the Illinois Department of Corrections[.]" On October 31, 2016, the trial court asked whether the range of punishment upon conviction would be "6-to-30 [years,]" to which defense counsel replied, "[i]t is[,]" and the State agreed. On March 6, 2017, the case proceeded to a jury trial. Before defendant's jury trial commenced, the trial court, the prosecutor, and defense counsel agreed, in defendant's presence, that the applicable sentencing range was "6 to 30 [years]."

¶ 6        During opening statements, the prosecutor, in reference to one of the videos the State planned to admit at trial, stated "[y]ou can't see good enough on the video to identify who it is, but you'll see that this figure comes around the corner, pauses, and then continues on."

¶ 7        The State's first witness, Denzel Diggins, testified that he was defendant's neighbor and had known defendant for about three years. On July 9, 2016, at approximately 4:00 p.m., Diggins drove a blue/green van to the Johnson Mini-mart (the mini-mart). The passengers in the van included Diggins's mother, brother, two nephews, and defendant. Initially, Diggins went into the mini-mart to buy some cigars for defendant but purchased the wrong cigars. Diggins went back

inside and returned with the wrong cigars again. Finally, defendant entered the mini-mart. After defendant returned to the van, Diggins left the mini-mart and drove away, eventually reaching Saratoga Street. Shortly thereafter, defendant asked Diggins to stop and let defendant out of the van at the corner.

¶ 8	At this time, the prosecutor presented People's exhibit No. 2, a map depicting the local streets in relation to the mini-mart. Diggins marked with an "x" where he dropped defendant off on Saratoga Street.

¶ 9	The State then presented People's exhibit No. 3, which Diggins identified as a photograph of the van driving down the street. Diggins testified that defendant was still in the van at the time the photo was taken. The State presented People's exhibit No. 4, which Diggins identified as a photograph showing Diggins exiting the van twice and then walking into the mini-mart. The State presented People's exhibit No. 5, which Diggins identified as a photograph of defendant standing outside of the van in front of the mini-mart. Diggins testified that all of the exhibits truly and accurately reflected the scene at the date and time in question. The State submitted the exhibits as evidence and published People's exhibit Nos. 2-5 to the jury.

¶ 10	Allaa Iwaisi, the owner of the mini-mart, testified that he was working at the mini-mart on July 9, 2016, around 4:00 p.m. At that time, a female customer came into the mini-mart with a big pink purse. Iwaisi recognized the woman as one of his regular customers. Iwaisi saw a man in line behind the woman. The man appeared to be in a hurry to reach the checkout. Iwaisi told the man "to hold on for her to buy her stuff." Iwaisi was unable to identify defendant in open court as the man who was in the mini-mart that day. Iwaisi authenticated People's exhibit No. 6, the videotape taken from a vantage point behind the counter inside of the mini-mart (cashier's counter video).

3

¶ 11    The victim testified that she walked from her home to the mini-mart on July 9, 2016, at 4:00 p.m. The victim was carrying a large pink tote bag containing clothes, money, a debit card, and a phone. The victim explained that while she was in line at the mini-mart purchasing several items the clerk told the man behind her to "wait until she's done." The victim finished her transaction and placed her purchases in the pink bag. The victim then walked across the street from the mini-mart and sat down on a ledge to talk with her friend, Camille Warner, on a cellular phone.

¶ 12    While sitting on the ledge, the victim noticed the man that had been behind her in the checkout of the mini-mart entering a blue/green van and leaving the parking lot. While the victim continued to talk on the phone to her friend, she noticed the same man walking up the side of the street near where she was sitting. As the man approached on foot, the victim noticed a squad car pass by her location. Right after the squad car passed by, the man walked up to the victim and told her "let me get that bag." The victim testified "[the bag] was kind of wrapped on my arm. I steadily kept trying to hold on to it as he was hitting me. I was like, finally, I was just like take it." After taking the bag from the victim, the man ran past her, jumped up on a little ledge, and continued running through an empty lot. The victim stood up and ran into the middle of the road, attempting to flag down the squad car that she believed was still in the area. The victim also called 911. Next, the State admitted and published People's exhibit No. 9, an audio recording of the victim's 911 call.

¶ 13    The victim testified that approximately two hours after the robbery, the police came to her home to show her a photo lineup, which was comprised of six photographs of African American males. The victim stated that no one suggested to her which photograph to select. With regard to her identification of the person who stole her purse, the victim stated:

4

"I remember at first I kind of, I was, this one. Then I was a little hesitant. I had to kind of recall, because it happened, and I remember like, because I was trying to picture the face as, you know, that somebody was over me because he, like I said, I was sitting and he was over me. So, I had to recall the face. Then I remember pointing out who it was."

The victim indicated that she picked "No. 5" as the person who stole her purse. A video recording of the photo lineup showed that the victim initially pointed to another individual before circling defendant, "No. 5," as the perpetrator. The victim explained that while she was upset from everything that happened, she was certain at the time that "No. 5" was the perpetrator. People's exhibit No. 10, "the photo lineup sheet," and People's exhibit No. 11, "the video identification," were published to the jury and admitted into evidence without objection. Next, the victim, utilizing People's exhibit No. 2, showed the jury where the events in question took place. The victim explained that the man rounded the corner off Saratoga Street. when he began walking toward her. The victim identified defendant in open court as the man who robbed her.

¶ 14 On cross-examination, the victim testified she had never met defendant before that day but remembered looking at defendant inside the mini-mart as she was putting her items into the pink bag. The victim remembered the assailant was wearing a white T-shirt and camouflage shorts. Regarding the photo lineup, the victim testified all six men depicted in the photographs were African American and similar in appearance. The victim acknowledged initially pointing to a different person than defendant, but stated she was "absolutely sure" defendant robbed her. The victim admitted that she had previous felony retail theft convictions.

¶ 15 Lindsay Bond, an officer with the Peoria Police Department testified that on the date and time in question he was patrolling in the vicinity of the mini-mart. Bond drove his squad car past

the mini-mart and noticed a female sitting directly across from the mini-mart with a male standing nearby. The two people appeared to be talking. Bond did not get a good look at the man.

¶ 16      Shortly thereafter, Bond received a request from the dispatcher to respond to a call where a woman reported her purse stolen. Upon arrival, Bond recognized the victim as the woman Bond previously noticed sitting across the street from the mini-mart. Bond reviewed the video footage from the mini-mart and put together a photo lineup.

¶ 17      Another officer, Officer Cox, who had no knowledge of the incident, presented the photo lineup to the victim. On the same day, Bond went to defendant's residence where he located defendant. Defendant told Bond that he walked both to and from the mini-mart earlier that day.

¶ 18      Bond testified he had viewed People's exhibit No. 7 (the walking video), and that the walking video truly and accurately reflected the area near the mini-mart at the time and on the date in question. The State admitted and published the walking video along with People's exhibit No. 8 (the parking lot video).[1]

¶ 19      A combination of the walking video, the parking lot video, and the cashier's counter video generally show: Diggins entering and exiting the mini-mart twice; the victim carrying a pink bag into the mini-mart; defendant, wearing a white T-shirt and camouflage shorts, exiting a blue/green van and entering the mini-mart; defendant standing behind the victim as she purchased items at the counter; Iwaisi speaking to defendant; the victim exiting the mini-mart; defendant making a purchase, exiting the mini-mart, entering the blue/green van, and driving away; the blue/green van driving toward Saratoga Street; a man wearing a white T-shirt turning the corner off of Saratoga Street and walking on the sidewalk across the street from the mini-mart toward the victim; a squad car driving past the mini-mart toward Saratoga Street; the man disappearing from camera view

---

[1]Due to technical difficulties, the walking video could not be played until the next day. The next day, the State published the walking video, along with the parking lot video to the jury.

seconds after the squad car drove by; the man running back into camera view and running through an empty lot back out of camera view; and the victim running into the street while waiving her arms.

¶ 20    During the State's closing argument, the prosecutor stated "So, when [defendant] saw [the victim] sitting there, he said to [Diggins], hey, man, stop the van. I want to get out. Then you saw the video clip of the figure coming around the corner." The prosecutor additionally stated, "you see the van go by and then you see him walking from that direction and coming down the road to head towards where [the victim] was resting."

¶ 21    During defense counsel's closing statement, the following exchange took place:

"[DEFENSE COUNSEL]: What about the testimony of Camille Warner? We didn't hear from her. She was supposedly on the phone when this robbery was occurring. Maybe she called the police. Maybe she didn't. She's just in Chillicothe. Yet, we don't hear anything from her.

What about the person across the street?

[THE STATE]: Judge, I'm going to object. There's no inference that can be raised. The defense didn't call those people.

THE COURT: Well, the jury can use its own determination as to what, if any, weight should be given to the inferences that counsel may wish to draw. It will be up to the jury to decide."

¶ 22    Following closing arguments and instructions from the court, the jury found defendant guilty of robbery. On April 5, 2017, defendant filed a "motion for judgment of acquittal notwithstanding the verdict or for new trial," arguing, in part, that the State failed to prove

defendant guilty beyond a reasonable doubt and that the prosecutor made improper remarks during closing argument. The trial court denied defendant's posttrial motion.

¶ 23    During sentencing, the prosecutor informed the court that defendant was eligible for an extended term of 6 to 60 years based on defendant's prior criminal record. Defense counsel immediately stated that defendant "did not know that he was facing six to 60 when he made the decision to go to trial." All parties agreed that defendant was improperly advised throughout the proceedings that he faced 6 to 30 years of imprisonment. Defendant stated "[d]uring the course of this trial or whatever, I didn't know I was facing six to 60 years. And when you asked at trial what was I facing, everybody on both sides said six to 30." Defendant additionally stated, "I think everybody in here done something wrong[,]" and professed his innocence. Defense counsel stated that "[i]n my conversation with the prosecution, we talked about six to 30 sentencing[,]" and "I thought we were looking at six to 30 sentencing, as my discussions had been with [defendant].

¶ 24    The trial court ultimately sentenced defendant to a term of 26.5 years in the Illinois Department of Corrections.

¶ 25                                    II. ANALYSIS

¶ 26    On appeal, defendant first argues he received ineffective assistance of counsel because defense counsel should have: (1) objected to the admission of the walking video; (2) sought to suppress the victim's photo lineup identification of defendant; and (3) requested a limiting instruction, or moved for a mistrial due to portions of the State's closing arguments.

¶ 27    It is well established that accused persons are guaranteed the assistance of competent counsel for their defense. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668, 685-686 (1984). In order to establish ineffective assistance of counsel, defendant must show that counsel's performance fell below an objective standard of

8

reasonableness, and that there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Id.*, at 669; *People v. Albanese*, 125 Ill. 2d 100, 106 (1988). Courts evaluate any purported deficiencies in counsel's performance by applying an objective standard of competence based on prevailing professional norms. *People v. Evans*, 186 Ill. 2d 83, 93 (1999). In deciding whether counsel provided ineffective assistance, this court employs a bifurcated standard of review, deferring to the trial court's findings of fact unless they are against the manifest weight of the evidence and, ultimately, considering *de novo* whether counsel's actions, or lack thereof, supports an ineffective assistance claim. *People v. Cunningham*, 2012 IL App (3d) 100013, ¶ 31.

¶ 28                                  A. "The Walking Video"

¶ 29          Defendant first argues trial counsel was ineffective for failing to object to the admission of "the walking video" because the walking video was unauthenticated.  Here, defendant raises his authenticity argument on page 10 of his brief where the following sentences appear, "[t]he only possible witness who could authenticate the video was the victim" and "presenting [the walking video] through the officer's testimony in this manner misled the jury to consider the walking video as independent corroboration of the defendant's presence in the area, while it's [*sic*] authenticity and relevance could only have been established through the victim's testimony." For purposes of this appeal, defendant does not allege the walking video was not authentic or an inaccurate recording of the events on the day of the occurrence. Defendant's passing reference to a lack of foundation for the admission of the walking video is problematic. It is well established that reviewing courts will not reach the merits of an argument not properly presented on appeal where there is no citation to any authority supporting the argument. *Bruntjen v. Bethalto Pizza*, LLC,

2014 IL App (5th) 120245, ¶ 141; Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). Accordingly, we are not persuaded and decline to review defendant's challenge to the authenticity of the walking video.

¶ 30   Next, defendant contends that due to the poor quality of the walking video, the exhibit was not admissible in the first place. According to defendant's argument on appeal, the man in the video captured walking in the area could not be identified due to the grainy images. Thus, defendant contends the trial court or defense counsel should have recognized the walking video lacked relevance and should have been excluded.

¶ 31   "Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." *People v. Lewis*, 165 Ill. 2d 305, 329 (1995). While the quality of the walking video is poor, the video footage is clear enough to show an African American male wearing a white T-shirt turning the corner off Saratoga Street and walking in the direction of the victim. The walking video was relevant because it depicts the timing and sequence of events that corroborated both Diggins's and the victim's versions of the events. As such, the walking video was relevant. It was within the province of the jury to decide what weight, if any, the video should be given. For this reason, we conclude defense counsel was not ineffective for failing to object to the admission of the walking video.

¶ 32                                B. The Photo Lineup

¶ 33   Next, defendant contends trial counsel was ineffective because defense counsel did not attempt to suppress the victim's pretrial identification of defendant. The case law provides that ineffective assistance of counsel does not arise when the omitted motion, such as a motion to suppress, would not have been successful. *People v. Kelley*, 304 Ill. App. 3d 628, 638 (1999).

¶ 34    It is well established that the following factors bear on the reliability of a pretrial identification: "(1) the witness' opportunity to view the suspect at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the suspect; (4) the level of certainty demonstrated at the time of the lineup; (5) the length of time between the crime and the lineup; and (6) any acquaintance with the suspect prior to the crime." *People v. Denton*, 329 Ill. App. 3d 246, 250 (2002); citing *Neil v. Biggers*, 409 U.S. 188 (1972). On appeal, the only factor defendant points out in support of the contention that the out-of-court identification was unreliable focuses on the fact that the victim was arguably indecisive and first selected someone else as the assailant.

¶ 35    We have carefully reviewed the video contained in this record and agree that the victim seemed uncertain at first. However, the victim quickly became very confident in her selection of defendant as the perpetrator after she had a chance to study the photo lineup further. Based on the record, we conclude the victim was not as indecisive as defendant claims and became confident in her final choice. Here, the photo lineup was properly conducted, and defendant has not raised a challenge on this basis.

¶ 36    Further, the victim's pretrial video identification of defendant seems to have played into defense counsel's trial strategy. During cross-examination, the victim admitted initially pointing to *another* individual as the robber. Accordingly, it would have been reasonable for defense counsel to rely on the video to establish the victim was unsure and easily could have been mistaken about the identity of the assailant. In other words, the pretrial identification, captured on video, allowed defense counsel to challenge the victim's credibility regarding the identity of her assailant.

¶ 37    For these reasons, we conclude trial counsel was not ineffective for failing to seek suppression of the photo lineup identification.

¶ 38                                    C. Closing Arguments

¶ 39        Defendant contends trial counsel should have objected to the following statement made by

the prosecutor during closing argument:

        "So, when [defendant] saw [the victim] sitting there, he said to [Diggins], hey, man,

        stop the van. I want to get out. Then you saw the video clip of the figure coming around

        the corner.

                                            * * *

        you see the van go by and then you see him walking from that direction and coming

        down the road to head towards where [the victim] was resting."

Defendant asserts these comments during closing argument were contradictory to the prosecutor's

concession during opening statements that the individual in the walking video could not be

identified.

¶ 40        The prosecutor's statements during opening statements and closing arguments concerning

the identity of the male depicted on the walking video do not appear to this court to be conflicting.

Defendant misconstrues the prosecutor's statement during closing arguments. The prosecutor did

not definitively assert that the walking video depicted defendant. The State merely suggested that

defendant's presence on the video was a reasonable inference the jury could draw based on the

other evidence presented.

¶ 41        Furthermore, even if the prosecutor's opening statements and closing arguments were in

some way contradictory, the jury was instructed by the court that neither opening statements nor

closing arguments are evidence, and that any statement or argument made by the attorneys which

is not based on the evidence should be disregarded. These jury instructions tend to negate any

potential prejudice to defendant. See *People v. Kliner*, 185 Ill. 2d 81, 127-28 (1998). For these reasons, defense counsel was not ineffective for failing to object to the prosecutor's comments.

¶ 42       Defendant also takes issue with the State's objection to defendant's argument that the State failed to call Camille Warner to testify. Defendant argues defense counsel should have objected to the prosecutor's objection to defense counsel's closing argument because the State's objection improperly shifted the burden of production of witnesses to the defense. We disagree.

¶ 43       It is generally improper for a prosecutor to comment on a defendant's failure to call a witness where the comment suggests that the witness would have testified unfavorably for the defense. *People v. Bianchi*, 96 Ill. App. 3d 113, 115-16 (1981). However, it is clear here that *defense counsel* suggested the absent witnesses would have testified unfavorably for the State. The prosecutor merely objected and argued defense counsel should not be allowed to raise such an inference unless defense counsel called the same witness in support of defendant. *People v. Irby*, 237 Ill. App. 3d 38, 69 (1992) (finding that no negative inference may be raised by the State's failure to call a witness where the same witness is known and available to defendant, but is not called by defendant). The prosecutor's comment was an abbreviated but correct reference to the law on this issue.

¶ 44       Further, the court's response, essentially overruling the State's objection, was curative and properly informed the jury that they could determine how much weight the jurors should assign to the inferences raised by defense counsel during closing argument. For these reasons, the State's comment to the court did not serve to shift the burden of production of witnesses to defendant. Accordingly, defense counsel was not ineffective for failing to object to the State's remarks to the court.

13

¶ 45                    D. Sufficiency of the Evidence

¶ 46        As noted by the State, defendant frames the next issue as the trial court's improper denial of defendant's motion for judgment of acquittal and motion for judgment notwithstanding the verdict. However, the pertinent question on appeal is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 47        It is not a function of this court to retry defendants when presented with challenges to the sufficiency of the evidence. *Id.* As such, "[a] criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Id.* Convictions may be upheld based on circumstantial evidence as well as direct evidence, and the jury need not disregard inferences that flow normally from the evidence before it. *People v. Patterson*, 217 Ill. 2d 407, 435 (2005). After an exhaustive review of the record, we conclude the State presented sufficient evidence to support the jury's verdict.

¶ 48        Here, the State charged defendant with robbery. Section 18-1(a) of the Code provides that "[a] person commits robbery when he or she knowingly takes property *** from the person or presence of another by the use of force or by threatening the imminent use of force." 720 ILCS 5/18-1(a) (West 2016). The evidence presented by the State included the parking lot video which recorded defendant's arrival at the mini-mart in a blue/green van. Defendant wore a white T-shirt and camouflage shorts. The cashier's counter video recorded defendant standing behind the victim in line at the mini-mart. The parking lot video also documented defendant leaving the mini-mart parking lot in the same blue/green van, driven by Diggins. The security footage was corroborated by Diggins's testimony. The victim and Iwaisi further corroborated the security footage from the inside of the mini-mart documenting defendant's attire and conduct.

¶ 49       Next, Diggins testified that he let defendant out of the van on Saratoga Street. While sitting across the street from the mini-mart, the victim noticed the same man that was behind her in the line at the mini-mart walking toward her on her side of the street. Similarly, the walking video depicts an African American man wearing a white T-shirt rounding the corner off Saratoga Street and approaching the victim's location. The victim testified the man forcefully took her bag. The victim explained that the man jumped up on a little ledge, and ran through an empty lot, which is corroborated by the walking video. The victim identified defendant in a photo lineup and in open court as the man that took her bag. This pretrial identification occurred approximately two hours after the incident.

¶ 50       Viewing the evidence in the light most favorable to the prosecution, we conclude the State's evidence was sufficient to prove defendant guilty of robbery beyond a reasonable doubt.

¶ 51                    E. *Krankel* Inquiry/Ineffective Assistance of Counsel

¶ 52       The record supports defendant's observation that "everybody" made mistakes with respect to the proper sentencing range, including defense counsel. Since this fact was undisputed by all present during the sentencing hearing, defendant argues the trial court should have stopped the sentencing hearing to conduct a *Krankel* inquiry. Because the trial court failed to do so, we have been requested to remand this case for a *Krankel* inquiry.

¶ 53       As an initial consideration, defendant's bare statement at the sentencing hearing that "I think everybody in here done something wrong" was insufficient under *Ayres* to trigger a *Krankel* inquiry. *People v. Ayres*, 2017 IL 120071, ¶ 18. Defendant failed to bring "a clear claim asserting ineffective assistance of counsel, either orally or in writing," necessary to trigger a *Krankel* inquiry. *Id*. Further, the purpose of a *Krankel* inquiry is to ascertain whether counsel was arguably ineffective for the purpose of appointing new counsel to represent defendant based on posttrial

15

claims of ineffective assistance of counsel. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). Luckily for defendant, the record reveals that the trial court already conducted an inquiry similar to a *Krankel* inquiry during defendant's sentencing hearing. The court's inquiry of both defendant and defense counsel definitively established that defense counsel had advised defendant of an improper sentencing range throughout the entirety of the criminal proceedings. Again, this poor advice by defense counsel was undisputed and the information to be garnered from such a proceeding on remand is already contained in this record.

¶ 54    Moreover, the record defendant seeks to develop on remand through a *Krankel* hearing, where the State's participation is minimal, would be better addressed in a postconviction petition. Several courts have discouraged allowing the State to participate in the preliminary stage of a *Krankel* inquiry because the proceeding is not intended to be adversarial in nature. See *People v. Jolly*, 2014 IL 117142, ¶ 40; See *People v. Fields*, 2013 IL App (2d) 120945, ¶ 41; See *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 86. For this reason, among others, we conclude this claim is better suited for collateral review where the issue of whether facts outside of the record reveal this defendant suffered prejudice attributable to defense counsel's self-admitted error. See *People v. Bew*, 228 Ill. 2d 122, 134 (2008).

¶ 55    Lastly, we examine defendant's contention that the trial court's mistaken recitation of the sentencing range, compounded by defense counsel's identical error, served to taint all levels of the criminal proceedings against defendant, resulting in a deprivation of defendant's due process rights. Based on a fair bit of speculation, defendant argues that if he had been told that he was facing a sentencing range of up to 60 years rather than 30 years, he may have chosen to accept a plea deal *in lieu* of trial. Whether a defendant has been deprived of his right to due process is subject to our *de novo* review. *People v. Williams*, 2013 IL App (1st) 111116, ¶ 79.

¶ 56     Defendant failed to properly raise this due process issue in a posttrial motion. Defendant urges this court to excuse the forfeited error based on the second prong of plain error, specifically, because the error here was so serious that it challenged the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). The burden of establishing plain error lies with defendant. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

¶ 57     Here, defendant made the decision to go to trial with the knowledge that he could receive a sentence of up to 30 years. Following trial, defendant was sentenced to serve 26.5 years, well within the range contemplated by defendant. Absent pure speculation, we cannot say the improper admonitions given to defendant served to prejudice the proceedings against defendant in any way. The 26.5 years defendant ultimately received is outcome determinative and negates any prejudice to defendant based on the unique facts of this appeal.

¶ 58     Further, the *Owens* holding does not serve as a basis to automatically vacate defendant's sentence as defendant suggests. *People v. Owens*, 377 Ill. App. 3d 302, 305-06 (2007). [holding that a defendant's sentence must be vacated on review, even if the sentence imposed by the court under the wrong sentencing range fits within the correct sentencing range, where the court relied on an improper range when imposing the sentence). Unlike *Owens*, it is undisputed that the trial court here relied on the proper sentencing range when imposing defendant's sentence. On this basis, we find *Owens* distinguishable.

¶ 59     In summary, the trial court erred when it improperly admonished defendant concerning a shorter sentencing range. However, the trial court's error cannot be said to have eroded the integrity of the judicial process, establishing second prong plain error, because the sentence imposed by the court was within the range defendant was informed that he could receive at the

17

time defendant made the final decision to proceed to a jury trial. Therefore, defendant fails to establish plain error and we honor defendant's procedural default of this issue.

¶ 60     We affirm defendant's robbery conviction.

¶ 61                                         III. CONCLUSION

¶ 62     The judgment of the circuit court of Peoria County is affirmed.

¶ 63     Affirmed.